IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

NORTH CAROLINA MAIL HAULERS        )
AND POSTAL LABOR LOCAL 8001,       )
AMERICAN POSTAL WORKERS UNION,     )
AFL-CIO,                           )
                                   )
        Plaintiff,                 )
                                   )
        v.                         )        1:06CV00840
                                   )
EAST COAST LEASING, INC.,          )
                                   )
        Defendant,                 )
                                   )
BJ TRUCKING COMPANY, INC.,         )
d/b/a Mail Transport Services,     )
                                   )
        Intervenor-Defendant.      )

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

OSTEEN, District Judge

        This matter came on to be heard on October 16, 2006, upon

Plaintiff's Motion for Preliminary Injunction.  After examining

the parties' filings and hearing arguments from counsel,[1] the

court makes the following findings of fact, conclusions of law,

and order.

---

        [1] Approximately one week after the hearing, Plaintiff
submitted a letter to the court, dated October 19, 2006.  The
letter was not filed with the Clerk of Court's office, and it
asserts matters over and above those addressed by the parties in
their filings and oral arguments.  The time for submitting
documents and making arguments is closed, and the letter was
improperly submitted.  Therefore, the court will not consider the
matters addressed in the letter.

**FINDINGS OF FACT**

1.  Plaintiff North Carolina Mail Haulers and Postal Labor Local 8001, American Postal Workers Union, AFL-CIO (the "Union") filed this action for declaratory and injunctive relief pursuant to section 301 of the Labor-Management Relations Act ("section 301"), 29 U.S.C. § 185 (2006).  The Union filed the action to prevent Defendant East Coast Leasing, Inc. ("ECL") from selling its business assets, including mail contracts with the United States Postal Service ("USPS") to Intervenor-Defendant B.J. Trucking Company, Inc. ("BJT") and going out of business before various grievance and arbitration claims are resolved.

2.  On September 27, 2006, the Union filed a motion for a temporary restraining order ("TRO") and preliminary injunction. After agreement by the parties, this court deferred ruling on the TRO and decided to rule on the preliminary injunction after a full hearing.  At the hearing on October 16, 2006, the court granted the USPS and Postmaster General's motion to be dismissed from the action and granted Intervenor-Defendant BJT's motion to intervene.  The court also heard oral arguments from the Union, ECL, and BJT.

3.  ECL is a North Carolina corporation in the business of transporting mail for the USPS by tractor/trailer trucks on specific highway contract routes ("HCR").  Each HCR is governed by a separate HCR contract between ECL and the USPS.

4.  The Union is an unincorporated labor organization which represents employees of ECL involved in providing transportation

2

services to the USPS.  From 2000 through the present, ECL and the Union have worked under a series of collective bargaining agreements ("CBA").  The current CBA is effective from May 1, 2005, through April 30, 2009.  The CBA does not include a successorship clause that would have required any successor acquiring ECL's business to adopt the CBA.  The CBA does, however, include a Letter of Intent acknowledging ECL and the Union's agreement that in the event of a future sale of ECL's business to a third party, ECL would have no obligation to require the purchaser to assume ECL's obligations under the CBA.  <u>See</u> Decl. of B. Mark Williams, Attach. 1, at 28.  The Letter of Intent also specifies that in the event of a sale, ECL will use "good faith efforts" to persuade a purchaser to hire ECL's employees.  <u>See id.</u>  Neither the Letter of Intent nor any other provision of the CBA gives the Union the right to bargain over ECL's decision to sell the business.  In fact, the "Management Rights" clause of the CBA expressly preserves as exclusive to management the "right to close, merge or sell the business, or any part thereof . . . ."  <u>See id.</u> at 22-23.  The CBA also includes a waiver provision expressing the parties' agreement not to demand bargaining on or reopening of the CBA, and an integration clause stating that the CBA is the "sole and complete agreement" of the parties.  <u>See id.</u> at 23.

   5.  After the current CBA became effective, ECL made a business decision to cease all operations and go out of business by selling certain of its assets, including its USPS HCR

contracts, to BJT. BJT is a North Carolina corporation that has prior experience in transporting mail for the USPS and wants to expand its operations. The proposed sale to BJT includes both tangible and intangible assets, and it will likely be achieved through a novation by the USPS allowing BJT to be substituted on the HCR contracts for the original contractor, ECL.

6. On September 1, 2006, ECL entered into an asset sale agreement with BJT and notified Plaintiff and all ECL's bargaining unit employees in writing that on or shortly after November 1, 2006, ECL intends to complete the transaction with BJT, novate ECL's USPS contracts to BJT, cease all operations, and lay off all ECL employees.

7. Under the asset sale agreement, BJT must consider ECL drivers for hire on a non-discriminatory basis. Pursuant to the Letter of Intent under the CBA, ECL has already provided BJT with driver contact information and made oral requests that BJT hire ECL employees. Currently, BJT has made no offers of employment to anyone, as the transaction is not yet certain to occur.

8. Under Article 8 of the CBA, ECL and the Union have agreed to resolve disputes relating to "wages, hours and conditions of employment," including complaints involving the "interpretation, application of, or compliance with the provisions" of the CBA by filing a grievance and appealing to an arbitrator if needed. See id. at 7-8 (setting forth grievance and arbitration procedures). The parties have agreed that "[t]he arbitrator will have no authority to (i) alter, delete or add to

4

any of the provisions of [the CBA], or (ii) substitute his or her discretion for that of any party to [the CBA] where such discretion has been expressly retained by such party . . . ." Id. at 8.

9.  The Union filed a grievance regarding the proposed sale of assets and the termination of ECL's employees asserting various issues including alleged violations of the CBA. The Union expects and intends to appeal the grievance to arbitration and claims that an arbitrator could find that ECL's actions violate express or implied provisions of the CBA. The Union claims that if the sale is not stopped, the Union and its members will be irreparably harmed due to permanent loss of employment, health insurance, and the benefits of the CBA. The Union also claims that if the sale has already occurred, a favorable ruling in arbitration would be an empty victory because it could not place the parties in the status quo ante. Therefore, the Union seeks to enjoin the sale and termination of employment to preserve the status quo until the grievance and arbitration process is complete.

10.  ECL and BJT have temporarily put the transaction on hold pending the court's ruling on Plaintiff's motion, but they hope to complete the sale after such ruling, as it is set to expire on its own terms if not closed by the end of November 2006. ECL and BJT allege that they will suffer irreparable harm if the sale is enjoined because each will lose their respective benefits of the bargain and have needlessly spent a great deal of

5

time and money on the transaction.  Further, ECL will be forced
to continue in a business it had decided to sell.  Finally, ECL
and BJT believe the timing of the deal is crucial with the
approaching busy and profitable holiday season and because the
deal may be lost forever if not soon consummated.

11.  Prior to the proposed sale at issue but under the
current CBA, ECL had sold some of its USPS contracts to BJT, and
the USPS approved the novation of those contracts.  Due to the
sale, ECL laid off 18 members of the collective bargaining unit.
Pursuant to its agreement in the Letter of Intent, ECL encouraged
BJT to hire the laid-off drivers.  BJT offered jobs to half of
those drivers, while BJT used its existing workforce to service
the rest of the routes.  The Union filed both a grievance under
the CBA and an unfair labor practices claim with the National
Labor Relations Board ("NLRB") in response to ECL's actions.  The
Union eventually withdrew its NLRB claims and all but one of its
claims under the CBA.  The Union has only recently begun to
proceed with arbitration of the remaining issue.  The grievance
challenging the instant transaction asserts many of the same
allegations the Union made in its earlier grievance, most of
which the Union has since withdrawn.

## CONCLUSIONS OF LAW

Based upon the foregoing Findings of Fact, the court
concludes as a matter of law that:

6

1.  The court has jurisdiction over this case pursuant to section 301 of the Labor-Management Relations Act.  <u>See</u> 29 U.S.C. § 185(a).

2.  Federal courts are generally prohibited from issuing injunctions in labor disputes under the Norris-LaGuardia Act ("NLA").  <u>See</u> 29 U.S.C. § 104 (2006) ("No court of the United States shall have jurisdiction to issue [a] temporary or permanent injunction in any case involving or growing out of any labor dispute . . . .").  The instant matter is a labor dispute within the meaning of the NLA.

3.  In order to reconcile the policy of promoting settlement of labor disputes through arbitration with the anti-injunction provisions of the NLA, courts have allowed injunctive relief in a narrow class of labor disputes.  <u>See</u> <u>Boys Markets, Inc. v. Retail Clerk's Union</u>, 398 U.S. 235, 241 (U.S. 1970).  The Fourth Circuit set forth the rare circumstances under which a section 301 injunction may be issued in a labor dispute in <u>Lever Bros. Co. v. Int'l Chem. Workers Union</u>, 554 F.2d 115, 119-20 (4th Cir. 1976), and its progeny.

4.  To issue an injunction, the court must first determine that the underlying dispute is subject to arbitration.  <u>Id.</u> at 119.  The Supreme Court has held that there is a presumption in favor of arbitration, such that an issue should be found to be arbitrable 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.  Doubts should be resolved in

7

favor of coverage.' _AT&T Techs., Inc. v. Commc'n Workers of Am._, 475 U.S. 643, 650, 106 S. Ct. 1415, 1419 (quoting _United Steelworkers of Am. v. Warrior & Gulf Navigation Co._, 363 U.S. 574, 582-83, 80 S. Ct. 1347, 1353 (1960)). Despite the presumption, it is the court's duty to decide whether a dispute is arbitrable. _Litton Fin. Printing Div. v. NLRB_, 501 U.S. 190, 208, 111 S. Ct. 2215, 2226 (1991) (citation omitted). Generally, courts refrain from examining the merits of underlying grievances when deciding arbitrability. _See, e.g._, _AT&T_, 475 U.S. at 649-50, 106 S. Ct. at 1419. However, because arbitration in this type of case is limited to matters covered by the CBA, deciding whether the dispute is arbitrable requires determining whether the grievance arises under the agreement. _See Int'l Bhd. of Elec. Workers v. GKN Aerospace N. Am., Inc._, 431 F.3d 624, 629 (8th Cir. 2005). If exercising the duty to decide whether a dispute is arbitrable means interpreting a provision of the CBA or otherwise looking to the merits, then the court cannot avoid its duty and must look to the merits. _Litton_, 501 U.S. at 209, 111 S. Ct. at 2227, _GKN Aerospace_, 431 F.3d at 627-28.

5. Second, to issue an injunction, the court must conclude that the union's position in arbitration is 'sufficiently sound to prevent the arbitration from being a futile effort. If there is a genuine dispute with respect to an arbitrable issue, the barrier . . . has been cleared.' _E.g._, _Lever Bros._, 554 F.2d at 120 (quoting _Amalgamated Transit Union v. Greyhound Lines, Inc._, 529 F.2d 1073, 1077-78 (9th Cir. 1976), *vacated and remanded*, 429

8

U.S. 807, 97 S. Ct. 43 (1976), *rev'd*, 550 F.2d 1237 (9th Cir. 1977)). Courts have held that an arbitration would be considered a futile endeavor if the arbitrator could not issue an award in favor of the Union, "consistent with the plain meaning of the [CBA]." See GKN Aerospace, 431 F.3d at 628; see also United States Postal Serv. v. Am. Postal Workers Union, 204 F.3d 523, 527 (4th Cir. 2000) ("[T]he arbitrator may not ignore the plain language of the [CBA].").

6. Next, the court must be satisfied that the moving party will suffer irreparable injury if the injunction is not granted. Lever Bros., 554 F.2d at 119 n.6 (citation omitted). Irreparable injury in a labor dispute "means not simply any injury resulting from a breach of contract that would not be fully redressed by an arbitral award, but rather 'injury so irreparable that a decision of the [arbitrator] in the union('s) favor would be but an empty victory'" and would not return the parties to the status quo ante. Int'l Ass'n of Machinists & Aerospace Workers v. Panoramic Corp., 668 F.2d 276, 285-86 (7th Cir. 1981) (citation omitted). Therefore, injunctions pending arbitration are only appropriate "when the actual or threatened harm to the aggrieved party amounts to a frustration or vitiation of arbitration." Id. at 286.

7. Finally, to issue the injunction, the court must determine that the harm to the moving party, should the injunction be denied, outweighs the harm to the non-moving party,

should the injunction be granted.  <u>Lever Bros.</u>, 554 F.2d at 119 n.6 (citation omitted).

8.   Each of the above standards must be met for a court to issue a section 301 preliminary injunction.  Despite allowing injunctions in the narrow class of cases that meets each of the <u>Lever Bros.</u> factors, courts still disfavor section 301 injunctions.  <u>See, e.g.</u>, <u>Boys Markets</u>, 398 U.S. at 253-54, 90 S. Ct. at 1594 (noting that section 301 injunctions should not be issued "as a matter of course in every case").

9.   The Union's underlying claim is not an arbitrable dispute under the CBA.  The underlying dispute in this matter is ECL's decision to go out of business and sell its assets to BJT. The United States Supreme Court and the Fourth Circuit have held that an employer has the right to cease operations for any reason and without the union's consent.  <u>See</u> <u>First Nat'l Maint. Corp. v. NLRB</u>, 452 U.S. 666, 686, 101 S. Ct. 2573, 2584-85 (1981); <u>Arrow Auto. Indus., Inc. v. NLRB</u>, 853 F.2d 223, 230-32 (4th Cir. 1988). Furthermore, as discussed above, the exclusive right of ECL management to decide whether to close its business is expressly granted to ECL in the Management Rights article of the CBA.  <u>See</u> Decl. of B. Mark Williams, Attach. 1, at 22-23.  Moreover, the CBA does not grant the Union the right to bargain over the decision to close operations but only the right to bargain over the impact such a decision will have upon the Union and its employees.  Absence of decisional bargaining rights shows that

10

ECL did not consent to arbitrate disputes regarding the decision to cease operations and sell its assets.

10. Moreover, under Article 8 of the CBA, it further appears that ECL and the Union did not agree to arbitrate disputes relating to ECL's exercise of its inherent right to cease operations and sell its assets. The parties expressly agreed to arbitrate only grievances, which are defined as disputes "relating to wages, hours and conditions of employment." Id. at 7. The court disagrees with the Union's assertion that this definition is broad enough to cover ECL's decision to go out of business. The definition of "grievance" in the CBA is nearly identical to the definition of mandatory subjects of bargaining in section 8(d) of the National Labor Relations Act (the "Act"). See 29 U.S.C. § 158(d) (2006). The Fourth Circuit has held that a decision to cease operations does not fall within the scope of "wages, hours and terms and conditions of employment" as found in the Act. See Dorsey Trailers, Inc. v. NLRB, 233 F.3d 831, 841-45 (4th Cir. 2000). Therefore, because the decision to close operations is expressly left exclusively to management and the grievance definition in the parties' CBA does not encompass such a decision, the underlying dispute is not arbitrable.

11. Furthermore, all of the Union's specific claims are either not arbitrable under the parties' CBA or are claims over which arbitration would be futile. The Union first alleges that the "transaction destroy[ed] the value of the entire CBA to the Union and the drivers." (Decl. of B. Mark Williams, Attach. 4.)

11

This claim is not arbitrable, or it would at the very least be a futile claim if submitted to arbitration. As discussed above, management has the exclusive right to close and sell its business. It is also well settled that labor contracts do not provide a guarantee of employment during their term of enactment. J.I. Case Co. v. NLRB, 321 U.S. 332, 334-35, 64 S. Ct. 576, 579 (1944); In re Continental Airlines Corp., 901 F.2d 1259, 1264 (5th Cir. 1990). Therefore, the Union has asserted no arbitrable issue with respect to ECL removing value from the CBA.

12. The Union next alleges that "[d]rivers will be terminated without just cause" and "[d]rivers are facing layoff under circumstances which are not permitted under the CBA." (Decl. of B. Mark Williams, Attach. 4.) These claims, under Articles 7 and 23 of the CBA, are based on a misinterpretation of those articles. Article 7 deals with "Discipline," and it limits the Union's ability to discipline drivers for misconduct or poor performance. It is irrelevant to the subject of a lay off based on a decision to go out of business. In addition, while Article 23 is entitled "Lay-Off," it covers only the procedures for laying off employees. It does not create substantive rights for employees, nor does it limit management's ability to lay off employees. It would not be possible for an arbitrator to issue an award in favor of the Union based on the plain meaning of either provision.

13. Next, the Union alleges that the transaction at issue is "in effect subcontracting outside the restrictions placed on

12

subcontracting in [Article 25]." _See_ _id._ Based on the plain
meaning of "subcontracting," the transaction between ECL and BJT
is not a subcontracting agreement. Instead, it is a sale of
assets to BJT with a novation substituting BJT for the original
contractor. Therefore, an arbitrator could not issue an award in
favor of the Union on this claim.

14. The next claim alleges that ECL "failed to provide
information" as required in Article 33. _See_ _id._ This claim is
irrelevant to the underlying dispute of ECL's decision to close
operations and to sell to BJT. Furthermore, the Union does not
provide any support for its assertion and does not even assert in
its filings that this claim is an arbitrable issue. Therefore,
this court finds that it is not an arbitrable issue.

15. The Union next claims that the proposed transaction is
an "abuse of management's rights" pursuant to Article 34 of the
CBA. _See_ _id._ First, courts typically rely upon management
rights clauses as grounds for _denying_ motions for section 301
injunctions, because such clauses grant rights to management
rather than limiting them. In addition, Article 34 clearly
expresses that ECL has the exclusive right to decide whether to
close or to sell the business. _See_ _id._, Attach. 1, at 22-23.)
With this exclusive right, the proposition that ECL's decision
amounted to an abuse of management rights makes little sense.
Although the Union attempts to disguise its attack on ECL's
decision to sell by implying that the transaction is a
circumvention of various rules, the Union cites no authority for

13

these alleged rules.  The decision to sell and how to accomplish
that sale are decisions left solely to management.  Therefore,
the dispute is not arbitrable.  Furthermore, as the parties
agreed in the CBA, the arbitrator cannot "substitute his or her
discretion for that of any party to [the] Agreement where such
discretion has been expressly retained by such party . . . ."
Id. at 8.  Therefore, even if the Union had shown that its claim
of abuse of management rights were an arbitrable dispute,
arbitration would be futile because the arbitrator would be
powerless to substitute his discretion for that of management.

    16.  The Union next asserts two claims based on the Letter
of Intent, dated April 30, 2005, that is incorporated into the
parties' CBA.  First, the Union claims that ECL knew of the
impending sale of assets when it signed the Letter of Intent.
This is essentially a claim that the Union was fraudulently
induced into signing the CBA, or more specifically, that it
violated section 8(a)(5) of the National Labor Relations Act by
bargaining in bad faith.  The Supreme Court has noted that
fraudulent inducement claims are not a proper subject of a
section 301 claim, which governs only contract violations and not
underlying contractual validity.  See Textron Lycoming
Reciprocating Engine Div., Avco Corp. v. United Auto., Aerospace
& Agric. Implement Workers of Am., 523 U.S. 653, 656-57, 118 S.
Ct. 1626, 1628-29 (1998).  Instead, the Court has recognized that
the NLRB should decide such claims.  See H.K. Porter Co. v. NLRB,
397 U.S. 99, 107-08, 90 S. Ct. 821, 825-26 (1970).  Furthermore,

14

a fraudulent inducement or bad faith bargaining claim does not fall under the definition of grievance as set forth in Article 8. It is not related to "wages, hours and conditions of employment" and does not involve "the interpretation, application of, or compliance with the provisions of [the CBA]." See Decl. of B. Mark Williams, Attach. 1, at 7. Instead, it asserts that the CBA as signed never should have been in effect. Finally, the waiver and integration articles of the CBA prevent the parties from reopening or renegotiating the CBA. See id. at 23. For these reasons, the fraudulent inducement claim is not arbitrable. Even if the claim were arbitrable, the Union has not demonstrated that it can provide evidence of any bad faith bargaining. Sending the matter to arbitration would also require the arbitrator to do what he is contractually bound not to do by "alter[ing], delet[ing] or add[ing] to . . . provisions of [the CBA]." See id. at 8. Therefore, even if the claim were submitted to arbitration, the arbitrator could not rule in favor of the Union based on the plain meaning of the CBA.

17. Also under the Letter of Intent, the Union asserts that "ECL has not made good faith efforts to persuade [BJT] . . . to employ the ECL workforce." See id., Attach. 4.) First, the sale of assets has not yet been consummated, so as Defendants suggest, it is difficult to tell whether this provision has been violated. However, Defendants have shown that ECL provided BJT with driver contact information, ECL made oral requests to get ECL drivers hired, and BJT has not yet made any offers of employment due to

15

the uncertainty of the transaction. Although the Union has
presented virtually no evidence to the contrary, this is the only
dispute that may potentially be arbitrable once the sale is
completed. Despite its possible arbitrability, this claim does
not relate to the underlying dispute over ECL's decision to cease
operations and sell its business. Therefore, arbitration over
whether ECL made good faith efforts to get its employees rehired
could not stop the sale and reinstate those employees' jobs. The
only remedy would instead be monetary: the difference between
what the drivers earn at new employment and what they could have
earned at BJT. As such, the Union and its members would
experience no irreparable harm if the sale were allowed to
proceed, because they could still receive their monetary award
and be made whole after the fact.

18. The Union's last claim is that the proposed sale
violates a covenant of good faith and fair dealing implied in the
CBA. See id. Examining the substance of this claim reveals that
it is nothing more than another misrepresentation or fraudulent
inducement claim. As discussed above, fraudulent inducement is
not the proper subject of a section 301 claim and it would force
the arbitrator to do what he is contractually bound not to do.
Furthermore, the Fourth Circuit and the leading labor law
treatise both recognize that claims of violations of the implied
covenant of good faith and fair dealing standing alone are not
arbitrable disputes. See E.I. Dupont De Nemours & Co. v.
Martinville Nylon Employees Council Corp., 78 F.3d 578, No. 94-

16

2222, 1996 U.S. App. LEXIS 3208, * 8-10 (4th Cir., Feb. 28, 1996); Elkouri & Elkouri, How Arbitration Works 480(6th ed. 2003) [hereinafter, "Elkouri, Arbitration"]. Instead, a party needs to couple the implied covenant violation with an allegation that a specific article of the CBA was violated for the claim to be arbitrable. Elkouri, Arbitration, supra, at 480. The reason is because the implied covenant cannot add new obligations to the labor agreement; it only governs the existing ones. Id. Therefore, standing alone, the Union's claim that ECL violated the implied covenant of good faith and fair dealing is not arbitrable.

19. After a close analysis of each of the Union's claims, this court determines that, with the exception of the Union's good faith efforts claim, both the underlying claim and each specific claim is either not subject to arbitration under the CBA or a claim upon which arbitration would be futile.

20. The Union's only claim that has the potential to be anything more than futile at arbitration is its claim that ECL violated the provision in the Letter of Intent requiring ECL to use "good faith efforts" to have BJT hire ECL employees. However, the Union must still meet the irreparable harm standard from Lever Bros. to receive a preliminary injunction based on this claim. As discussed above, a monetary remedy is the only suitable remedy for such a claim because it does not relate to the validity of the underlying sale. Therefore, even if a preliminary injunction is denied, the Union and its members could

17

still get the monetary remedy that may result from arbitration and be made whole. Therefore, if the injunction is denied, Plaintiff will suffer no irreparable harm such that arbitration would be for them an empty victory.

21. The fourth <u>Lever Bros.</u> factor is that the harm to the moving party if the injunction is denied must outweigh the harm to the non-moving party if the injunction is granted. Although the Union has not met the first three standards under <u>Lever Bros.</u>, the court should address this final factor to complete the analysis. As discussed above, the Union cannot demonstrate any irreparable harm, because the only one of its complaints that is potentially a non-futile, arbitrable claim would only result in a monetary award, which it could receive whether or not the sale is enjoined. In contrast, if the sale is enjoined, ECL and BJT will lose the benefit of their deal, a deal which is crucial to ECL's desire to go out of business and BJT's desire to expand business. Each will also lose the time and money already put into the transaction. Therefore, the harm to Defendants if the injunction is granted would greatly outweigh any harm Plaintiff will suffer if the injunction is denied.

22. The Union's underlying claim and the majority of its other allegations present no arbitrable issues. ECL's failure to use good faith efforts in getting BJT employees hired is the only potentially non-futile, arbitrable claim, but Plaintiff cannot show that arbitration of this claim would be frustrated by allowing the sale to proceed. Furthermore, the balance of harms

18

weighs greatly in favor of Defendants.  Therefore, according to
the standards set forth in <u>Lever Bros.</u> and its progeny,
Plaintiff's motion for preliminary injunction should be denied.

**<u>ORDER</u>**

IT IS THEREFORE ORDERED THAT Plaintiff's Motion for
Preliminary Injunction [3] is DENIED.

This the 27th day of October 2006.

_____
United States District Judge